Welch, C. J.
In the case of Sinks v. Reese, (19 Ohio St. 306,) this court held that exclusive jurisdiction over the asylum was vested in the United States, and that its inmates were not entitled to vote at township, county, or State elections. Since the decision of that case, but less than a year preceding the date of the election here contested, congress passed the act of January 21, 1871, which reads as follows:
“ Be it enacted by the senate and house of representatives of the United States in congress assembled, That the jurisdicdiction over the place purchased for the location of the “national asylum for disabled volunteer soldiers,” etc., and upon which said asylum is located, is hereby ceded to the State of Ohio and relinquished by the United States. And the United States shall claim or exercise no jurisdiction over said place after the passage of this act: Provided, That nothing contained in this act shall be construed to impair the powers and rights heretofore conferred upon the board of managers of the national asylum for disabled volunteer soldiers, incorporated under said act, in and over said territory.”
The propositions contended for by counsel for the plaintiff in error are these:
1. Admitting that the United States had acquired exclusive jurisdiction over the asylum, the jurisdiction was divested by the act of January 21, 1871.
2. If the jurisdiction was so divested, the residence of the inmates prior to the date of the act, must be considered as part of their year's residence, so as to constitute them “ residents of the state for one year next preceding the election,” within the meaning of the state constitution.
3. If these propositions cannot be maintained, then it is contended that the case of Sinks v. Reese should be reconsidered and overruled, or, at least, that the facts in regard to the exercise of jurisdiction, agreed upon in the present case, are so far different from those appearing in Sinks v. Reese, as to warrant a different judgment.
If the first two named propositions are maintainable, the last need not be considered. Are they maintainable ?
*441 On the part of the defendant it is claimed that the act of January 21, 1871, is ineffective to divest the United States of its jurisdiction, for three several reasons, namely :
1st. It is suicidal; or, in other words, repugnant. The proviso repeals everything supposed to be ceded in the purview.
2d. It can have no operation until accepted by the legislature of Ohio.
3. * * * So long as the asylum is maintained as a needful building, exclusive jurisdiction is a constitutional incident, the consent of the State having been secured : and congress cannot divest itself of its legislative power.
We will consider these reasons in the order in which they are here stated.
1. Is the act “ suicidal”? Does its proviso nullify its purview ? In other words, does the act reserve to the board of managers all the rights and powers relinguished to the State. If the rights and powers reserved are not the full and exact equivalent of those relinquished, nay, if this is not necessarily and clearly the case, then they can stand together, and both must have legal operation and effect.
The thing relinquished is “ exclusive jurisdiction.” The thing reserved is “ the powers and rights conferred upon the board of managers incorporated under said act.” Exclusive jurisdiction is nothing less than absolute sovereignty, the unlimited power to make, apply, and execute laws. It is the power to enact a code or codes of laws, not for specified and limited objects, but for any and all purposes, and to establish and regulate courts for the enforcement of those laws; and an executive department to carry them into effect. Such were the powers possessed by congress over the place in question, when it granted this charter to the board of managers; and the simple question is, did they all pass by that charter to the corporation ? That is to say, had the charter been made irrepealable, would it have divested congress of all jurisdiction over the place ? It seems to me that the very statement of the question is its own answer. If it be true of the United States, then it is true of a state, or of any sovereign *442 power, that a charter of incorporation for special and limited objects divests it of sovereignty over the territory involved. No one will, I think, contend, for a moment, that had this charter been granted by the State of Ohio, instead of the United States, and had it been made irrepealable and unalterable, the State would thereby have divested itself of jurisdiction over the territory in question. The same rule must apply where the grant is by the United States. This charter is a grant of specified and limited corporate powers, and no matter how numerous and extensive they may be, there is still left in the sovereignty, that residuum of power which constitutes sovereignty or general jurisdiction. The charter of the board of managers merely invests them with the ordinary powers of an eleemosynary corporation, and for a merely temporary purpose. I am quite clear in the conviction, that the effect of the act of relinquishment — its purview and proviso taken together — is simply to place the State and this corporation in the same relation to each other, as they would have sustained had the charter been granted by the State, and made irrepealable and unalterable. True, this Corporation is but an instrumentality of the general government, its creature and trustee, and therefore, whatever is reserved to the corporation, is in effect reserved to the United States. But this by no means varies the case. It matters not whether we regard the proviso as being in the nature of a contract between the corporation and the State, a treaty between the State and general government, or a condition subject to which the State is to exercise its jurisdiction. In either aspect the result is the samei namely, that the State resumes its jurisdiction, subject only to such rights and powers as the corporation, or, if you please, as the United States, acting by and through the corporation, could claim under its present charter. In other words, nothing is reserved by the proviso above the dignity of corporate rights and powers. What are these rights and powers. They are, as I have said, the ordinary powers of an eleemosynary corporation. The act of their creation “ constitutes” them “ managers of an establishment for the care and relief of disabled volunteers *443 of the United States army, * * * with power to take, hold, and convey real and personal property, establish a common seal, and to sue and be sued in courts of law and equity ; and to make by-laws, rules and regulations, for carrying on the business and government of the asylum, and to affix penalties thereto : provided that such by-laws, rules and regulations, are not inconsistant with the laws of the United States.” (U. S. Stat. at Large, vol. 14, p. 10). The act also (sec. 8) declares “ that all inmates of the asylum shall be, and they are hereby made subject to the rules and articles of war, and will be governed thereby, the same as though they were in the army of the United States.” But the act does not say that these “ rules and articles of war” shall be enforced by the board of managers, much less does it give them any power to enact new rules or articles of war.
Is this a grant of absolute jurisdiction ? Is it a transfer of that sovereignty over the place vested in congress by the cession of the State ? Conceding, for argument’s sake, the power of congress thus to transfer its jurisdiction to a corporation, does this charter purport to make any such transfer ? It is said that it does, because it gives the power to enact “by-laws,” intrusts the “government” of the asylum to the board of managers, and authorizes them to impose “penalties.” Ny-laws are not laws, in the general or jurisdictional sense. They are limited to the objects of the incorporation. They are laws for a particular and special purpose, and not for all purposes. The same may be said of the word “ government.” It is the word used in defining the functions of the directors of a bank, the trustees and faculty of a college, or the authority exercised by a parent over his household. The managers are authorized to impose “ penalties.” But these penalties can only be inflicted for violation of authorized by-laws, and, therefore, they have the same limited range as the by-laws themselves. No one familiar with the language of charters of incorporation will suppose, that it was the intention by these words to vest in the board of managers the power to establish and maintain upon this territory a “ government,” in the jurisdictional sense *444 of that term ; to vest them with absolute sovereignty ; to empower them to enact a complete code of “ laws,” including a constitution, and to establish and regulate departments of government, legislative, judicial, and executive. Their authority is limited to the objects and purposes of the charity. They can pass no laws on the general subjects of legislation, the enforcemet of civil rights and criminal liabilities, the regulation of marriages, and the thousand other subjects of sovereign legislation; nor can they establish courts for the enforcement of such laws, or give jurisdiction •to the courts of the United States to enforce them. In fact they can enact no laws whatever. They can only enact bylaws, that is, laws incidental to, and limited by the objects of the charity which they were organized to administer. Their power of ‘‘government,” and to inflict “ penalties,” is, moreover, a power in personam. It is confined to a single class of persons, and does not extend to all the inhabitants of the place. It is true, that the proviso in the act of 1871 speaks of their powers and rights as being “ in and over the territory.” But by this we understand merely their proprietary rights, their right to hold, use, and dispose of the real estate. If, however, it can be understood otherwise, it can add nothing to the original grant of power. The reservation of a power not granted, is no grant of the power.
Much stress is placed upon the 8th section of the act, subjecting the inmates of the asylum to the “rules and articles of war.” We cannot see that this provision confers upon the corporation any powers whatever. It has its whole operation and effect upon the soldiers. It is a simple declaration by congress that soldiers who choose to enter the asylum “shall be and are hereby made” subject to rules and regulations already established, or to be established by congress. This is quite far from being a grant of authority to the board of managers, either to make such rules and regulations, to declare the soldiers subject to them, or to enforce them. To my mind it is an implied denial of any such authority. The matter is left to rest exclusively between congress and the soldiers. The rules and regulations already exist, and *445 congress simply declares them binding upon the soldiers who may choose to enter the asylum. Upon their entry there these rules and regulations, ipso facto, and without any action of the board of managers, become applicable and binding, in so far as they can be made binding under this provision.
For these reasons we are quite satisfied^that there is not that necessary inconsistency between the proviso and the purview óf the act of retrocession, which brings the case within the rule, that a repugnant proviso nullifies the body of the act. It is a rule of necessity, and of last resort. To apply it in any case, is to stultify the legislature. To apply it in the present case, is to hold that congress, by the same act, have both granted and reserved the jurisdiction in question. We see no necessity for so construing the act. On the contrary, it seems to us that the body of the act and its reserving clause can well stand together, and each have force and effect, by restoring to the State its suspended jurisdiction, but without the power to violate the franchises of the corporation.
2. Is the consent of the State necessary, in order to the retrocession or relinquishment of jurisdiction ?
We are quite clear in the opinion that it is not. The cession by the State was not a cession of absolute and perpetual jurisdiction. It was, in effect, a mere suspension of juristion. The State jurisdiction was not extinguished by the grant, but merely suspended. There was a reversion left in the State. This is so, because the purposes for which the grant was made are temporary. The right to exercise the jurisdiction granted was to be exclusive while it continued, but it was to be a mere temporary right. It could not, at the farthest, out-last the lives of the “ disabled volunteers in the late rebellion,” and it was liable at any time'to be terminated by an abandonment, or diversion of the property from the purposes of the grant. The thing really granted was jurisdiction during the pleasure of congress, but not to be extended beyond the lives of the soldiers. When congress abandons the jurisdiction, or when the disabled soldiers all die, the *446 thing granted, which was at first indeterminate, has been terminated, and fully enjoyed, and expires by its own limitation. The fact that the legislature of Ohio refused to accept the jurisdiction so receded, or relinquished, has no significance. The very ground of that refusal may have been that there was no necessity for such acceptance.
3. Had congress the power thus to divest itself of the jurisdiction ?
That congress can own and use such property, for the purposes specified, without jurisdiction over the territory, and while the jurisdiction still remains in the State, seems to be conceded by counsel, and is quite well settled by authorities. (Commonwealth v. Young, Brightly R. 322 ; Clay v. Kansas, 4 Kan. 50 ; People v. Godfrey, 17 J. R. 52 ; United States v. Ames, 1 Woodb. & Minot, 77).
It is equally well settled, and seems also to be conceded, that having acquired the jurisdiction, congress may divest itself thereof, and thus restore it to the State, by abandonment of its use, or by parting with the ownership. It was upon this theory of the law, that congress passed the act of 2d March, 1819 (Bright. Dig. 48.9), which has ever since been acted upon and acquiesced in, providing that jurisdiction of the United States over military sites which had been abandoned should “ cease.” Although the direct object of that act probably was, merely to render certain the fact that the abandonment of the property was final, and not merely temporary, yet it seems plainly to have been conceived and passed in the belief that congress could, at any time, divest itself of jurisdiction over such places, by simple legislative act. Be that as it may, the act is authority to show, what I say seems to be admitttd here, that congress has the power by at least one method, namely, by the abandonment of the use and ownership of the property, to re-vest the jurisdiction in the State.
But if the use of the property and the jurisdiction can thus be acquired separately, why may they not be relinquished separately ? If congress can unite them, can it not also sever them ? There is no good reason why the two *447 powers shall not co-exist, or why the one should not be held to imply the other. If congress, without consent of the State, acquires title to the property, and uses it for the purposes specified, and subsequently acquires the jurisdiction, is congress powerless to put itself in statu quo, by restoring the jurisdiction ? Or rather, is it necessary, when congress finds a jurisdiction thus, as it were, fastened upon it, and desires to be relieved of it, first to abandon or sell the property, and then to re-purchase it and resume its use ? This, it seems to be admitted, can be done. What congress can thus do indirectly it can do directly. If it can part with the jurisdiction by a sale and re-purchase, it can part with it by a direct act of relinquishment. There is nothing in the reason or nature of the thing, and I see nothing in the constitution to prevent it. The proposition is this, that congress has power both to acquire and to part with the title and the jurisdiction, with the limitation, however, that whereas they may be acquired separately, they can only be parted with conjointly.
The argument by which counsel seek to support a proposition apparently so absurd, is that jurisdiction over such places is an original inherent power vested in congress, of which, therefore, it cannot divest itself. The answer to this argument is twofold. In the first place, it proves too much.' If this is an original and inherent power of congress, then congress is powerless to part with it by any means whatever. But it is admitted that congress can part with the jurisdiction, provided only that it be effected by an indirect method, that is, by sale and re-purchase of the property. But the second and more direct answer is, that jurisdiction over any such place is not an original or inherent power of congress. It is only by a superficial reading of sec. 5, art. 1, of the constitution, that we mislead ourselves into the supposition that it is such. An original or inherent power of congress is a power vested in that body by the people of the United States, and which, therefore, inheres as a necessary part of its very nature and existence, and without which it would cease to be congress. To sav that congress *448 cannot part with any of its inherent powers, is simply to say that congress cannot destroy itself, or become something other or less than itself. But is jurisdiction over the asylum at Dayton one of those original and inherent powers? Surely not. It is a secondary and acquired power, and not one that is original and inherent. It was acquired from the State of Ohio, and not from the people of the United States. Congress can exist, and has long existed, without the power. It is no more original and inherent than is the title to the laud, acquired in like manner by congress. The original and inherent power of congress in the premises, was the power to acquire the jurisdiction, and not the jurisdiction itself. The fallacy consists in substituting one of these powers for the other, and we are apt to be led into this fallacy by the peculiar wording of the constitution. (Art. 1, sec. 5.). It gives “ power” to congress to “ exercise exclusive legislation ” over all such places “purchased” by congress “ by the consent of the legislature of the State.” The effect would have heen the same had the provision been: “ Congress is authorized to purchase and hold the title ” to such place, and to acquire from the State and exercise jurisdiction therever; “and the consent of the State to the purchase shall be deemed and held a sufficient grant of such jurisdiction.” The constitution divested the State of no jurisdiction, and, thereover, vested none in congress. The transfer of jurisdiction to congress requires the joint action of congress and the State, and is a matter which belongs exclusively to them. The constitution had no agency in the transfer. It found the jurisdiction in the State, and left it there. It merely gives to congress the power to acquire and use the thing granted, and prescribes a form or manner in which the grant may be made. • No matter what may be the form of the grant, whether by consent to the purchase, or, as in this case, by direct cession, it is, nevertheless, in fact and in law, a grant by the State.
If this be so, it must follow that congress may relinquish the jurisdiction at its pleasure, as it may acquire it at pleasure. The “power” to acquire and “exercise” the juris *449 diction, implies the power to omit its acquisition, and, as I think, also implies the power to acquire it, in part, as well as in whole. The direct and simple object of the provision was, to enable congress to do that which, without such an enabling provision, it could not do, namely, to acquire and hold title to such property, and to acquire and exercise jurisdiction thereover, in such cases, to such extent, and during such times, as congress might deem expedient. The constitution gave the necessary power, but left the full discreti on as to its exercise to congress.
It must be said also, that we are not at liberty to declare-an act of congress unconstitutional unless it is clearly so.. We are quite unable to say that such is the character of the act in question. On the contrary, we believe .it to be a legitimate exercise of congressional power, and that its-effect was to restore to the State its urisdjiction over the-asylum.
These 105 inmates of the asylum were, therefore, residents and citizens of Ohio, at the time of the election. Were they residents of the “ State,” for the full year, within the meaning of the constitution of Ohio? We think they were. In one sense, the “ State” isa territory. In another sense it is a political organization. These inmates have resided for the whole year in the same place. Territorially, they, and the asylum in which they reside, have been all the-time in the State. Politically, or, if I may. so speak, jurisdictionally, both have been temporarily out of the State. The expression is used in both senses. It is used in the territorial sense in the agreed statement filed in the case. In-favor of the right of suffrage we think it safe and proper to-give it that meaning in the constitution. In the primary and popular sense the asylum is and always has been in Ohio. It has never ceased to be part of the State of Ohio geographically, although the State jurisdiction over it has been temporarily suspended. Suppose a township or part of a township of one county temporarily attached to another county and re-attached to the first. Would legal voters-after each change have to begin de novo their twenty days. *450 residence in the township and their thirty days residence in the county ? I think not. And yet the cases supposed are identical in principle with the one in hand. Both rest on the same provision of the constitution, requiring a prescribed length of residence in the State, county and township. If there is any difference between the principle involved in the two cases, it is in this, that while in the cases supposed the change of jurisdiction is in fact temporaiy, in the present case it was necessarily temporary, the jurisdiction having been granted for a temporary purpose, the reversion always remaining in the State. It seems to us it is sufficient that the voter, at the time of the election, has a residence, in the political and jurisdictional sense of the terms, within the proper political division, and has resided in the same place for the prescribed length of time, to fulfil this requirement of the constitution. In such a case it is true, in the primary sense of the words, that there is no change of residence, but merely a change of jurisdiction. To say that there is a change of residence is to give the words a secondary meaning.
Without, therefore, reconsidering the case of Sinks v. Reese, or determining whether the facts of that case essentially differ from those of the present, we are brought to the conclusion that the 105 votes so rejected were legal votes, and that the judgment below must be reversed, and the defendant in error adjudged not to have been legally elected.
We have no power or right, in a case like the present, to declare the contestor elected. He had not a majority of the votes cast at the election. The legal votes for him which were rejected, or rather their excess over like votes for the contestee rejected, although they are to be counted against the contestee, in order to defeat his election, cannot be counted for the contestor, in order to secure his election.
Judgment accordingly.
White, Day, McIlvaine and West, JJ.,. concurred.